## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

BILLY DWAYNE WHITE,

    Petitioner,

    v.

DEBORA DARDEN, *Warden*, and
MARYLAND ATTORNEY GENERAL,

    Respondents.

Civil Action No. TDC-18-3284

## MEMORANDUM OPINION

Petitioner Billy Dwayne White, a self-represented inmate confined at the Eastern Correctional Institution ("ECI") in Westover, Maryland, has filed a Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 collaterally attacking his 2011 conviction in the Circuit Court for Baltimore County, Maryland for second-degree rape and second-degree assault. Although White filed the Petition against the Attorney General of Maryland, the proper respondent on a § 2254 petition is the "person who has custody over" the petitioner, in this case the Warden of ECI. *See* 28 U.S.C. § 2242 (2018); *Rumsfeld v. Padilla*, 542 U.S. 426, 434–35 (2004); *see also* Rule 2(a), Rules Governing Section § 2254 Cases in the United States District Courts ("§ 2254 Rules"). Accordingly, the docket will be amended to add ECI Warden Debora Darden as the Respondent.

The Petition is now fully briefed. Upon review of the submissions, the Court finds no need for an evidentiary hearing. *See* § 2254 Rule 8(a); D. Md. Local R. 105.6. For the reasons set forth below, the Petition will be denied.

## BACKGROUND

On May 26, 2011, a jury in the Circuit Court for Baltimore County ("the Circuit Court") found White guilty of second-degree rape and second-degree assault. The evidence at trial established that on December 21, 2009, White drove a 31-year-old woman he knew from attending Narcotics Anonymous meetings to get something to eat. While in the car in a parking lot, White ordered the victim to pull down her pants. She refused. As she resisted, White got on top of her, removed her pants, held her down, and raped her. White then ordered the victim to pull up her pants and began driving her home. When the car stopped at a red light, the victim jumped out and ran to her church, from which she called a friend, Glen Vincente Zetina, who drove her to the police station to report the rape.

On July 21, 2011, the court sentenced White to 20 years of imprisonment on the second-degree rape conviction. The second-degree assault conviction merged for sentencing purposes. On August 5, 2011, White, proceeding *pro se*, filed with the Clerk of the Circuit Court a letter in which he stated that he "would like to file for an [a]ppeal, an[d] review of sentence, and also for a[] modification or reduction of sentence." State Record ("S.R.") 14-15, ECF No. 7-1. The letter was docketed as a *pro se* "notice of appeal." S.R. 7. The Circuit Court also construed the August 5, 2011 letter as a Motion for Modification or Reduction of Sentence and docketed that motion on August 18, 2011.

On July 20, 2012, the Court of Special Appeals of Maryland affirmed White's convictions by unreported opinion. The mandate issued on August 20, 2012. White did not file a petition for a writ of certiorari with the Court of Appeals of Maryland.

On September 18, 2015, the Circuit Court denied the Motion for Modification or Reduction of Sentence. On March 4, 2016, White filed another Motion for Modification or Reduction of

Sentence pursuant to Md. Rule 4-345(e), which the Circuit Court denied on March 8, 2016 on the grounds that "this court has no authority to consider a Motion for Modification" where "[m]ore than 90 days have passed since Mr. White was sentenced." S.R. 8.

On June 9, 2016, White filed a Petition for Post-Conviction Relief in the Circuit Court. The court held a hearing on the petition on October 18, 2017, denied the Petition on October 25, 2017, and docketed the decision on November 6, 2017. On November 19, 2017, White mailed an Application for Leave to Appeal to the Court of Special Appeals, which denied it on July 17, 2018. The mandate issued on August 16, 2018.

White's Petition for a Writ of Habeas Corpus filed with this Court was received on October 24, 2018. Where White provided a Certificate of Service stating that it was mailed on October 19, 2018, and it was mailed in an envelope that bears a stamp from ECI dated October 22, 2018, the Court will treat the Petition as filed on October 19, 2018. *See Houston v. Lack*, 487 U.S. 266, 275-76 (1988) (holding that a prisoner's petition is deemed to have been filed on the date it was deposited with prison authorities for mailing under the "mailbox" rule); *United States v. Dorsey*, 988 F. Supp. 917, 919-920 (D. Md. 1998) (citing *Houston*); *see also* § 2254 Rule 3(d) (discussing the mailbox rule).

## DISCUSSION

In the Petition, White presents eight claims for habeas relief. He asserts that his trial counsel provided constitutionally ineffective assistance of counsel by (1) threatening during voir dire that he would be viewing the trial from the lock-up if he did not stay quiet; (2) failing to present certain evidence; (3) failing to prepare for trial; (4) failing to cross-examine witnesses; (5) failing to object to the trial court's denial of a jury request to see a transcript from his bail hearing; (6) failing to contact witnesses to testify at his sentencing hearing; (7) failing to file a motion for

3

modification of his sentence; and (8) failing to prevent certain prospective jurors from being seated on the jury.

Respondents seek dismissal of the Petition as time-barred and, in the alternative, argue that the asserted claims are meritless.

## I.      Legal Standard

A federal petition for a writ of habeas corpus may be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). The federal habeas statute sets forth a highly deferential standard for evaluating state court rulings, under which state court decisions are to "be given the benefit of the doubt." *Bell v. Cone,* 543 U.S. 447, 455 (2005); *see Lindh v. Murphy,* 521 U.S. 320, 333 n.7 (1997). A federal court may not grant a writ of habeas corpus unless the state court's adjudication on the merits (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). A state court adjudication is contrary to clearly established federal law under § 2254(d) when the state court (1) "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law"; or (2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court's]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

[A] federal habeas court may not issue the writ simply because [it] concludes in its independent judgment that the relevant state-court decision applied established federal law erroneously or incorrectly." *Renico v. Lett*, 559 U.S 766, 773 (2010) (quoting *Williams*, 529 U.S. at 411). The state court's application of federal law must be "objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409).

Under § 2254(d)(2), "a state court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010) (citation omitted). The fact that "reasonable minds reviewing the record might disagree about the finding in question" is not enough to deem a state court's factual determination unreasonable. *Id.* Rather, a state court's factual determinations are presumed correct, and a petitioner who brings a habeas petition in federal court must rebut facts relied upon by the state court with "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). More specifically, "for a federal habeas court to overturn a state court's credibility judgments, the state court's error must be stark and clear." *Cagle v. Branker*, 520 F.3d 320, 324 (4th Cir. 2008) (citing 28 U.S.C. § 2254(e)(1)).

## II.    Statute of Limitations

Respondents first argue that the Petition is time-barred. A one-year limitations period applies to federal habeas petitions in non-capital cases filed by a person convicted in state court. *See* 28 U.S.C. § 2244(d). Specifically:

> (1)    A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—
>
> > (A)    the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
> >
> > (B)    the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United

States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) the time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).

Here, White's convictions became final on September 4, 2012 with the expiration of time to file a petition for a writ of certiorari in the Maryland Court of Appeals. *See* Md. Rule 8-302(a) ("If a notice of appeal to the Court of Special Appeals has been filed . . . , a petition for a writ of certiorari may be filed . . . not later than the later of 15 days after the Court of Special Appeals issues its mandate or 30 days after the filing of that court's opinion."). Respondents therefore argue that the one-year limitations period expired on September 4, 2013 because the state Petition for Post-Conviction Relief, which would have tolled the limitations period, was not filed during that one-year period.

White, however, had filed a Motion for Modification or Reduction of Sentence pursuant to Maryland Rule 4-345 on August 5, 2011, and that motion was not ruled upon until September 18, 2015. At the time that Respondents filed their Answer, the question of whether such a motion tolls the limitations period was pending before the United States Court of Appeals for the Fourth Circuit. On April 17, 2019, the Fourth Circuit ruled that a motion to reduce the sentence under Md. Rule 4-345 is a motion seeking collateral review and thus tolls the limitations period for a federal habeas

petition set forth in 28 U.S.C. § 2244(d). *See Mitchell v. Green*, 922 F.3d 187, 195, 198 (4th Cir. 2019). In light of *Mitchell*, White's Motion for Modification or Reduction of Sentence tolled the limitations period from August 5, 2011 to September 18, 2015.

Thus, the one-year limitations period did not begin to run until September 19, 2015. It continued to run for 264 days until June 9, 2016, when White filed his state Petition for Post-Conviction Relief, which tolled the limitations period until that petition was denied on November 6, 2017. *See* 28 U.S.C. § 2244(d)(2). The limitations period then ran for the 12-day period from November 7, 2017 to November 19, 2017, when White mailed his Application for Leave to Appeal the Denial of Post-Conviction Relief. *See Houston*, 487 U.S. at 275-76. After the mandate issued on the denial of the Application by the Court of Special Appeals on August 16, 2018, the limitations period ran for an additional 64 days until White filed the instant Petition on October 19, 2018. Thus, prior to the filing of the instant Petition, a total of 340 days had passed, less than one year, during which there were no qualifying state post-conviction filings that tolled the limitations period under § 2244(d). Accordingly, White's Petition is timely, and his claims will be reviewed on their merits.

## III.    Ineffective Assistance of Counsel

In the Petition, White frames all of his claims as based on ineffective assistance of counsel. The Sixth Amendment to the United States Constitution guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense." U.S. Const. amend. VI. In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court held that to prevail on a claim of ineffective assistance of counsel, a petitioner must establish two prongs: deficient performance and prejudice. *Id.* at 692. First, the petitioner must show that counsel's performance was deficient in that counsel "made errors so serious that counsel was not

functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Deficiency exists when "counsel's representation fell below an objective standard of reasonableness" under "prevailing professional norms." *Id.* at 688; *see Wiggins v. Smith*, 539 U.S. 510, 521 (2003). "Judicial scrutiny of counsel's performance must be highly deferential" and apply "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.*

Second, a petitioner must show prejudice in that the deficient performance by counsel consisted of errors that "were so serious as to deprive the defendant of a fair trial" whose result was reliable. *Id.* at 687. To establish such prejudice, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A "reasonable probability" is one "sufficient to undermine confidence in the outcome." *Id.* A petitioner is not entitled to post-conviction relief based on prejudice where the record establishes that it is "not reasonably likely that [the alleged error] would have made any difference in light of all the other evidence of guilt." *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

When evaluating a state court's application of *Strickland* under the requirement in 28 U.S.C. § 2254(d) that a petition may be granted only if the state court's determination "was contrary to, or involved an unreasonable application of, clearly established Federal law," 28 U.S.C. § 2254(d)(1), a federal court must apply both standards. "The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so."

*Harrington v. Richter*, 562 U.S. 86, 105 (2011) (internal citations omitted). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

### A.    Trial Counsel's Statement During Voir Dire

White's first claim of ineffective assistance of counsel is based on his trial counsel's alleged statement to him during jury selection that he "would be doing trial from lock-up if [he] didn't keep quiet." Pet. at 6, ECF No. 1.  At a bench conference during jury selection, Juror No. 180 stated that he would not be able to be impartial because "I just don't like rape basically. Plus, it's not my thing." 5/24/11 Trial Tr. at 78-79, ECF No. 7-3.  According to the trial transcript, immediately after this remark was made, White made an inaudible statement, which he has since testified was, "I'm not a rapist." Post-Conviction Hrg. Tr. at 17, ECF No. 11-1.  The juror then apologized but stated that he had a friend who was a rape victim. Juror No. 180 was ultimately excused for cause and did not serve on the jury.

At the post-conviction hearing, White testified that after he said, "I am not a rapist," his trial counsel said, "Mr. White, if you don't shut up, you will be doing the trial from lock up." *Id.* at 19.  The trial transcript does not reflect that this statement, or any other statement by trial counsel in response to White's statement, was made.  However, when the prosecutor later asked the trial judge to caution White not to speak to a juror, the trial judge stated, "I thought [trial counsel] took care of that for me," then told White "to not do that again." 5/24/11 Trial Tr. at 81-82.

In rejecting this claim, the state post-conviction court concluded that the trial transcript did not substantiate White's allegation that his attorney told him to "shut up" in front of Juror No. 180, and that in any event White had not demonstrated prejudice. S.R. 38.  The state court is correct that there is no record of the alleged statement.  Even if it were made and arguably denigrated

9

White in front of a prospective juror, it was not prejudicial because Juror No. 180 was struck for cause and never sat on the jury. Further, because the colloquy with Juror No. 180 occurred at a bench conference, the alleged statement would not have been heard by any other prospective jurors. Though White has claimed that there was an audio issue that allowed all prospective jurors to hear statements made in bench conferences, the fact that this statement was not sufficiently audible to be recorded by the court reporter supports the conclusion that it was not heard by the venire. Accordingly, the state post-conviction court's ruling is supported by the record, and was neither contrary to, nor involved an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d). The Petition will be denied as to this argument.

### B.    Jury Selection

White also alleges ineffective assistance arising from his trial counsel's failure to "keep jurors off" the jury. Pet. at 7. He specifically refers to Jurors No. 94, No. 128, and No. 133.

During voir dire, each of these jurors answered affirmatively when asked whether they or a family member had been a victim or witness to a crime or had been convicted of a crime. Juror No. 94 stated that her sister had witnessed a murder 10 years ago, and her mother had been the victim of an assault during a breaking and entering at her house six years ago. Asked whether these incidents would affect her ability to be fair and impartial in this case, Juror No. 94 replied, "No. I don't think so." 5/24/11 Trial Tr. at 27. When the trial judge followed up by asking if she could commit to listen to the evidence, follow the jury instructions, and render a fair and impartial decision, Juror No. 94 stated, "Yes." *Id.* at 27-28.

Juror No. 128 said that he and his wife witnessed their car being stolen in 2006 or 2007, and he was arrested when he was a teenager for drug possession 12 years ago but was not convicted. Juror No. 128 stated that he was "[n]ot completely" satisfied with the investigation into

the vehicle theft. *Id.* at 48. He told the court that he could commit to listen to the evidence at trial, follow the court's instructions, and render a fair and impartial decision.

Juror No. 133 stated that his brother had been mugged about 30 years ago, and that his cousin was raped during a jewelry store robbery about 25 years ago. In response to the question whether he would commit to listening to the evidence, follow the court's instructions, and render a fair and impartial decision, he answered, "I think I can commit to that." *Id.* at 56. When asked if he had any doubt about his commitment, Juror No. 133 responded, "I—no. I don't think so. I think I can keep a pretty open mind. Yeah." *Id.* When the trial judge stated, "I need a commitment." Juror No. 133 said, "I'll commit to it." *Id.* The trial judge clarified that she was not "insisting" that he make such a commitment to being impartial, but because the court could not have a juror who was "equivocal" on this issue, if he could not commit, she needed to know that. *Id.* at 56-57. After this explanation, the trial judge asked Juror No. 133 if he could be "fair and impartial," to which Juror No. 133 replied, "I believe I can. Yes." *Id.* at 57.

White's counsel did not ask any questions of these prospective jurors or move to strike them for cause. Notably, however, White did not ask his trial counsel to move to strike any of them.

White did not raise this issue in his state post-conviction petition, but he asserted it orally at the post-conviction hearing as to Jurors No. 94 and No. 133. The state post-conviction court found no ineffective assistance arising from trial counsel's decision not to move to strike these jurors. In all three cases, the prospective jurors stated that they could be fair and impartial despite the fact that they or their family members had been victims of crime. The prior experiences for Juror No. 94 and Juror No. 128 were not similar to the facts at issue in the present case. Although Juror No. 133 had a cousin who was a rape victim 25 years before, another prospective juror, Juror

11

No. 182, had stated that his fiancée and ex-wife had been victims of rape, 15 and 8 years before, respectively. Trial counsel had asked a follow-up question of Juror No. 182 and moved to strike him, but the motion was denied because he had stated that he could be fair and impartial. As compared to Juror No. 133, Juror No. 182 had closer personal relationships with two different rape victims, and those victims had been assaulted more recently than Juror No. 133's cousin. Thus, where the trial judge denied trial counsel's motion to strike Juror No. 182, it stands to reason that a motion to strike Juror No. 133 would have been unsuccessful. Accordingly, the failure to seek to strike this juror was neither deficient performance nor prejudicial. The Petition will be denied as to this claim.

### C.    Failure to Present Evidence

White further alleges that trial counsel provided ineffective assistance by failing to introduce into evidence: (1) the victim's cell phone records; (2) surveillance video recordings; (3) area maps; and (4) a weather report. White asserts that this evidence would have impeached the testimony of the victim and Zetina, the victim's friend who picked her up at their church, by casting doubt on the victim's testimony that she fled from White's car when it was stopped at a red light at East Drive and Linden Avenue in Arbutus, Maryland.

At the post-conviction hearing, White testified that the victim's cell phone records would show that the victim's account of the timing of when she allegedly fled his car, ran to the church, and called Zetina did not match up with the entries in the phone records. He also asserts that the phone records would demonstrate that he had an ongoing relationship with the victim. White testified that he wanted area maps and weather reports introduced into evidence to show that the intersection from which the victim fled was two miles away from the church, and that there was substantial snow on the ground from a storm two days before, such that it was impossible for the victim to have reached the church within the half-hour time frame testified to by the State's

witnesses.  Further, a map would show that there was a fire station closer to that intersection, to which the victim should have went to seek assistance.  White also asked trial counsel to obtain the surveillance video from a bank at that intersection that would show whether the victim fled from his car at that location.

At the post-conviction hearing, White acknowledged that trial counsel had considered several of these issues.  She told him that the phone records would not be useful, but he could not articulate the reason provided, which appeared to relate to the understanding that "tower signals" would not show useful information.  Post-Conviction Hrg. Tr. at 33.  He also acknowledged that his trial counsel told him that she had sent a detective to see if there were bank surveillance cameras covering the relevant location, and that the detective reported back that there were none.  White claimed that his trial counsel lied to him because she could not remember the name of the detective and others had told him that the cameras were in place.  He also stated that his trial counsel had decided that the maps were not necessary.  The post-conviction court concluded that White's claims that this evidence would have successfully impeached the State's witnesses with this evidence was "speculation and conjecture," that White was not credible in his allegations about the surveillance cameras, and that trial counsel had "executed sound trial strategy."  S.R. 40-41.

Based on the trial record, the Court concludes that the post-conviction court's conclusion that trial counsel's decisions relating to this evidence did not constitute deficient performance was not an unreasonable application of *Strickland*. 28 U.S.C. 2254(d)(1).  The record reflects that trial counsel sought surveillance video records but that none was available, and that the state post-conviction court found White's claims to the contrary not credible.  *See Merzbacher v. Shearin*, 706 F.3d 356, 364 (4th Cir. 2013) ("For a federal habeas court to overturn a state court's credibility judgments, the state court's error must be stark and clear.").  As to the phone records, it is unclear

how the phone records would have been useful because although the victim testified that she called Zetina from the church, and then received a phone call from White while she was at the police station reporting the rape, she did not testify that she made any cell phone calls from the intersection from which she fled.  To the extent that White contends that cell phone records could otherwise show her location at various times, trial counsel's explanation that "tower signals" would not provide such information establishes that she considered this issue and determined that it would not lead to probative information.  Post-Conviction Hrg. Tr. at 33.  Although White also argues that the phone records would show that he had had phone conversations with the victim before the date of the incident, the victim admitted that fact in her testimony.

As for the maps and weather report, trial counsel's failure to present them was not deficient performance.  These issues were already addressed in the evidence, as trial counsel elicited from Zetina on cross examination that the distance from the intersection to the church was about one mile.  White testified that there had been a significant snowstorm two days before and that there was snow on the ground.  Notably, White has not shown that Zetina's testimony was incorrect and that the distance was actually two miles, as he has claimed.  And where the snowstorm occurred two days before, not during the incident, trial counsel could reasonably have concluded that focusing on White's theory that the victim could not have walked one mile in 30 minutes, even with snow on the ground, was not a sound trial strategy.  Particularly where the core of this case is the question of whether the victim consented to sexual activity in White's car, trial counsel's decision not to focus on this issue was not an unreasonable trial strategy.  *Harrington*, 562 U.S. at 109 ("There is a strong presumption that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than sheer neglect.").

14

Thus, the Court concludes that the post-conviction court's ruling on this issue, which relied in part on credibility determinations, was not an unreasonable application of *Strickland*, and White presents no evidence to question the state court's findings. *See* 28 U.S.C. 2254(d); *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) ("28 U.S.C. § 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them.").

### D.  Failure to Prepare for Trial

Beyond the issues about failing to present evidence, White more broadly claims ineffective assistance arising from his trial counsel's failure to meet with him to prepare for trial "except the day before postponements and day of trial only." Pet. at 6.  He generally alleges many disagreements with his trial counsel, that she was not interested in his case, and states that he considered firing her but decided against it.  In denying this claim, the state post-conviction court found that trial counsel met with White on at least four occasions, and that although White complained to his trial counsel's supervisor, the issue was "resolved" when trial counsel came to see him the day after he complained. S.R. 42.

In his Petition, White does not explain how his general dissatisfaction with the number of times he met with trial counsel in person amounted to constitutionally ineffective representation or resulted in prejudice. The only specific issue he raises is his claim that his trial counsel did not alert him to the bail hearing transcript used to cross examine him during trial, an issue addressed separately below. *See infra* part III.F. Accordingly, the post-conviction court's determination was not an unreasonable application of the *Strickland* standard.

### E.    Failure to Cross-Examine

White next alleges that trial counsel was deficient for failing to cross-examine Zetina and the victim more thoroughly. As to Zetina, at the post-conviction hearing, White asserted that his trial counsel should have further cross-examined him on his assertion that the weather was nice that evening, with no snow on the ground, and his recollection of where he picked up the victim. On the snow issue, as discussed above, the Court does not find that the failure to pursue White's theory that snow on the ground rendered the victim's account implausible was deficient performance. *See supra* part III.C.

On the pick-up location, Zetina testified at trial that he picked up the victim at the Hope Presbyterian Church, but in his statement to the police on the night of the incident, he apparently said that he picked her up at the intersection of Shelburne Avenue and Linden Avenue, which is a few blocks away. Trial counsel tried to highlight this discrepancy during the testimony of Officer Wickless, who interviewed Zetina on the night of the incident, but the trial judge sustained an objection to her questioning because she had not specifically confronted Zetina with his prior statement and given him an opportunity to explain it. *Cf.* Fed. R. Evid. 613(b). White argues that trial counsel should have then sought to recall Zetina as defense witness to do so, though it is not at all clear that she would have been permitted to do so. Though trial counsel arguably should have confronted Zetina with his prior statement in order to allow Detective Wickless to testify to his prior inconsistent statement, White has not shown how the inability to highlight this discrepancy caused prejudice. Where the two locations are only a few blocks apart, the Court does not find that the inability to elicit this testimony caused prejudice under *Strickland*.

As for the cross examination of the victim, White does not identify any particular deficiency but notes that trial counsel told him, when he objected to the short length of her cross

examination, that she could recall the victim in her case-in-chief, but she never did. Although the cross examination of the victim was not extensive, trial counsel established that the victim and White had spoken over the phone on multiple occasions and thus had a preexisting relationship, and as discussed above, the failure to pursue a theory that the victim could not have walked a certain distance in a certain time was not deficient. Beyond those issues more generally identified in the Petition, White has not identified a line of questioning that should have been pursued. Notably, trial counsel separately challenged the victim's testimony by eliciting prior inconsistent statements through Officer Wickless, and by cross examining the forensic nurse who examined the victim on the question of whether the victim's injuries were consistent with consensual sex. Viewing this issue in the context of these overall efforts to challenge the victim's account, the Court finds that trial counsel's decisions regarding cross examination fall within the ambit of trial strategy, such that the post-conviction court's rejection of the ineffective assistance of counsel claim based on inadequate cross examination was not an unreasonable application of *Strickland.* *See Burch v. Corcoran*, 273 F.3d 577, 588 (4th Cir. 2001) (noting the "strong presumption" that "counsel's strategy and tactics fall within the wide range of reasonable professional assistance"); *Hunt v. Nuth*, 57 F.3d 1327, 1333 (4th Cir. 1995) (noting that "a grading of the quality of counsel's cross-examination" did not establish deficient performance by trial counsel).

### F.      Bail Transcripts

Under the broad heading of ineffective assistance of counsel, White also asserts constitutional error arising from the trial judge's refusal to grant the jury's request to see the transcript from his bail hearing. At trial, during the cross examination of White, the prosecutor questioned White about his statement on direct examination that the December 21, 2009 incident was the only time he had sexual contact with the victim. He then asked White if he recalled

testifying at his bail hearing, in response to the prosecutor's statement that the victim had no prior sexual history with White, that he and the victim had been "together previous times." 5/25/11 Trial Tr. at 156, ECF No. 7-4. When White stated that he did not recall that testimony, the transcript was marked for identification as Exhibit 2 and presented to White in an attempt to refresh his recollection. White then testified that his statement that they had been "together" was not a reference to a sexual encounter, and signified only that they been together in person before. *Id.* at 157. During rebuttal argument, the prosecutor noted that White's credibility was suspect because he had given conflicting testimony at trial and at the bail hearing on this issue. During deliberations, the jury sent a note requesting to see the bail hearing transcript. The trial judge denied the request on the grounds that it had been marked for identification only and had not been admitted into evidence.

White does not explain how this determination supports a claim of ineffective assistance of counsel. To the extent that White argues that his trial counsel should have objected to this ruling, the state post-conviction court correctly concluded that the trial court did not err in denying the request because the transcript, like most transcripts used for impeachment or to refresh recollection, was not admitted in evidence. While White separately argues, as part of his broad claim of inadequate trial preparation, that his trial counsel was ineffective for not having shown the transcript to him in advance and prepared him to answer questions about it, the Court finds that even if his trial counsel did not do so, White has not shown any prejudice. Indeed, his response— that his statement that he and the victim had been together before was not meant to refer to a sexual encounter—was a reasonable response, not exhibiting a lack of preparation, which did not allow the State to establish a clear inconsistency of testimony. This claim provides no grounds for habeas relief.

### G.    Sentencing Witnesses

White also alleges ineffective assistance of counsel based on his trial counsel's failure to contact identified witnesses for his sentencing hearing, which resulted in a postponement of his sentencing hearing. In rejecting this claim, the state post-conviction court found that White had suffered no prejudice due to the postponement and that at the rescheduled sentencing hearing on July 21, 2011, White's mother and two friends, Ray Elgert and Bill Barkley, spoke on his behalf. A fourth individual attended the hearing but decided she did not want to speak. White claims that he, rather than trial counsel, ended up contacting these individuals to secure their presence. Even if that were true, there was no prejudice because White's identified witnesses appeared at the sentencing hearing. The Court therefore agrees with the state post-conviction court's determination that the *Strickland* standard was not satisfied.

### H.    Failure to File a Motion for Modification of Sentence

White also claims that his trial counsel failed to file a motion for modification of the sentence despite his request that she do so. In denying this allegation of error, the post-conviction court noted that White successfully filed a timely *pro se* motion for modification. In denying the motion, the trial court specifically stated that it had reviewed White's filings and "the entire file" of the case and maintained that the sentence was "fair and reasonable." S.R. 15. White neither alleges, nor does the record demonstrate, that the sentence would have been reduced had trial counsel filed the motion. Where prejudice has not been shown, the state court's rejection of this claim was not an unreasonable application of *Strickland.* Consequently, this claim provides no basis to award federal habeas relief.

### I.    Prejudice

Finally, even if one or more of the acts or omissions by trial counsel could be deemed to be deficient performance, the Court finds more broadly, based on a review of the trial record, that

19

White has not shown prejudice. The trial largely centered on the question of whether the victim or White was telling the truth about whether their sexual encounter was consensual. On that issue, the State presented substantial evidence corroborating the victim's account, including Zetina's testimony that the victim reported the rape to him shortly after it occurred, that she was appeared shaken and was extremely upset, and that he saw bruises on her arms. The State also presented the testimony of a police detective, Detective Bonsall, who also observed the bruises on her body. Finally, the State presented the testimony of Mary Merryman, the nurse who examined the victim, who observed not only injuries to the victim's body, but also injuries to her vaginal area that were not consistent with consensual sex. Crucially, she testified that there was forensic evidence of sexual penetration, which directly contradicted White's claim that there was no such penetration. In light of this evidence, any mistakes made by trial counsel on the specific points identified by White were "not reasonably likely" to have made "any difference in light of all the other evidence of guilt." *Berghuis*, 560 U.S. at 390. In the absence of prejudice, the Petition will be denied.

## IV.    Certificate of Appealability

A petitioner may not appeal the dismissal or denial of a federal habeas petition without first receiving a certificate of appealability. 28 U.S.C. § 2253(c)(1). The Court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a district court rejects a claim on the merits, a petitioner satisfies the standard by demonstrating that "jurists of reason could disagree with the district court's resolution of [the] constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Buck v. Davis*, 137 S. Ct. 759, 773-74 (2017) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003)).

White has not made the requisite showing.  Accordingly, the Court declines to issue a certificate of appealability.  White may request that the United States Court of Appeals for the Fourth Circuit issue such a certificate.  *See* Fed. R. App. P. 22(b).

## CONCLUSION

For the foregoing reasons, the Petition will be DENIED. The Court declines to issue a certificate of appealability.  A separate Order shall issue.

Date:   November 24, 2021

THEODORE D. CHUANG
United States District Judge